

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
12/20/2017

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **9 HOUSTON LLC,** | § | **Case No. 17-35614** |
| | § | |
| **Debtor.** | § | |
| | § | **Chapter 11** |
| | § | |

## MEMORANDUM OPINION REGARDING THE DEBTOR'S EMERGENCY MOTION TO SELL APPROXIMATELY 3.378 ACRES OF LAND LOCATED IN HOUSTON, HARRIS COUNTY, TEXAS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS
### [Doc. No. 18]

### I.  INTRODUCTION

In this single asset real estate case, a dispute has arisen over whether a portion of the estate's sole asset—a tract of raw land—should be sold pursuant to an emergency motion rather than through a plan of reorganization.

On November 27, 2017, 9 Houston LLC, the debtor-in-possession (the "Debtor"), filed its Emergency Motion to Sell approximately 3.378 acres of land located in Houston, Harris County, Texas free and clear of all liens, claims, encumbrances and other interests (the "Motion"). [Docket No. 18]. On November 28, 2017, CC3 Post Oak Park Holdings LLC ("CC3"), the largest creditor in the case, filed a limited objection to the Motion. [Docket No. 19]. On November 29, 2017, CC3 filed its amended limited objection to the Motion. [Docket No. 23]. On November 30, 2017, the Debtor supplemented the Motion describing why this Court should consider the relief requested by the Debtor on an emergency basis. [Docket No. 24]. Finally, on December 6, 2017, CC3 filed an amended objection to the Motion. [Docket No. 33].

On December 7, 2017, this Court held a hearing on the Motion.  The Debtor appeared through its attorney of record.  Additionally, CC3 appeared through its attorneys of record.  In its case-in-chief, the Debtor introduced four exhibits into the record, and adduced testimony from two witnesses.  In its case-in-chief, CC3 introduced seventeen exhibits into the record, and adduced testimony from one witness.  The Court then listened to closing arguments from counsel, and took the matter under advisement.

The Court now issues these findings of fact and conclusions of law setting forth why it has decided to grant the Motion.  The Court issues these findings and conclusions pursuant Bankruptcy Rules 7052 and 9014.[1]  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such; and, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.  The Court reserves the right to make additional findings and conclusions as the parties may request or as this Court deems appropriate.

## II.        FINDINGS OF FACT[2]

1. The Debtor is a privately-held corporation whose primary asset is 5.397 acres of undeveloped property located at 1317 Post Oak Park Drive in Houston, Texas, one block east of Loop 610 [Debtor's Ex. No. 2] (the "Entire Tract").[3]  The Entire Tract is a stone's throw away from the very fancy and fashionable Galleria shopping mall.

---

[1] Reference herein to "the Bankruptcy Rules" is a reference to the Federal Rules of Bankruptcy Procedure.  Further, any reference herein to "the Code" is a reference to the Bankruptcy Code, which is set forth in 11 U.S.C.  Finally, any reference herein to a section is a reference to the specific section of the Code, unless otherwise denoted.

[2] The Court makes these findings based upon: (a) the exhibits introduced at the hearing held on December 7, 2017; (b) the testimony adduced at this hearing; and (c) taking judicial notice of the docket in this case and the representations made in the various pleadings on the docket.  *In re Quade*, 496 B.R. 520, 524 (Bankr. N.D. Ill. 2013), *affirmed*, 498 B.R. 852 (N.D. Ill. 2013) (a "bankruptcy court [is authorized] . . . to take judicial notice of its own docket").

[3] The Entire Tract was formerly improved as a multi-family residential project, but this building was demolished.

2. The Debtor acquired the Entire Tract in 2014. It did so by obtaining a loan from CC3, a private lender. Prior to closing on this loan, the Debtor had 120 days to do its due diligence pursuant to the purchase and sale agreement that it had executed; and the closing actually took place 170 days after the contract was executed. The loan to the Debtor from CC3 is evidenced by a promissory note executed by the Debtor dated August 11, 2014, in the original principal amount of $21.0 million (the "Note"). The Note is secured by a deed of trust that the Debtor also executed on August 11, 2014. There is no dispute that CC3 is the present owner and holder of a properly perfected first lien on the Entire Tract.

    a. The per diem interest under the Note at the non-default rate is $4,865.64;

    b. The per diem interest under the Note if the default rate is used is $7,077.29 (i.e., the sum of $4,865.64 and $2,211.65); and

    c. The per diem for the service fee under the Note is $56.45. [CC3's Ex. No. 5].

3. The Debtor purchased the Entire Tract with the intention of developing this land. However, the Debtor experienced cash flow problems and has been unable to achieve this objective. Indeed, the Debtor's cash flow problems have not only prevented the Debtor from developing the Entire Tract, but also resulted in the Debtor failing to make scheduled payments under the Note and, additionally, failing to pay ad valorem taxes to Harris County. The Debtor has not made a payment under the Note since April of this year, nor has the Debtor paid the taxes due and owing on the Entire Tract for 2015, 2016, or 2017.

4. Because the Debtor defaulted under the Note, CC3 posted the Entire Tract for a foreclosure sale on October 3, 2017.

5. In order to prevent the foreclosure sale from going forward, the Debtor filed a Chapter 11 petition on September 30, 2017 (the "Petition Date").

6. In its Schedule A, the Debtor represents that, as of the Petition Date, the value of the Entire Tract was $29,398,000.00. [Debtor's Ex. No. 3]

7. Before the Petition Date—in August of 2017—the Debtor retained a real estate brokerage firm, Jones Lang LaSalle Brokerage, Inc. ("JLL") for the purpose of marketing all or any portion of the Entire Tract. After the Petition Date, the Debtor obtained this Court's permission to retain JLL as a professional rendering services on behalf of the Debtor's estate. [Docket No. 27]

8. JLL did, in fact, market the Entire Tract. In marketing the Entire Tract, JLL was able to obtain three written offers—although each of these offers was for less than all of the Entire Tract.

9. One of the entities that submitted an offer is Martin Fein Interests, Ltd. ("MFI"). MFI has approximately 100 employees, and is in the business of constructing luxury apartments with 200-350 units. The cost of past apartment complexes built by MFI has ranged from $20 million to $100 million.

10. MFI is owned and controlled by Martin Fein ("Fein"). Fein holds a bachelor's degree from the University of Indiana and a law degree from the University of Louisville. He has been in the real estate investment and development business for more than forty years, and has completed forty-three (43) developments in Houston and other areas outside of Texas. Some of the recent luxury apartment projects that he (through MFI) has overseen and completed in the Houston area are: (a) The Olympia at Willowick Park Apartments located adjacent to the wealthy neighborhood of River Oaks; (b) The Mark

Cityplace Springwoods Village located in the toney neighborhood north of Houston known as The Woodlands; (c) The Belvedere at Springwoods Village Apartments, which is also located in The Woodlands; and (d) The Grand at LaCenterra Apartments located in the rapidly growing and thriving neighborhood west of Houston called Cinco Ranch—which is near the so-called energy corridor (where many oil and gas companies have their headquarters).

11. MFI's offer is for a 3.378 acre portion of the Entire Tract (the "Property"). The essential terms of the proposed transaction, as set forth in a written Purchase and Sale Agreement that is a 23-page single-spaced document (with exhibits attached) executed by both the Debtor and MFI on November 22, 2017 (the "PSA") [Debtor's Ex. No. 1], are as follows:

   a.  Purchase price: $19,865,000.00;

   b.  Initial deposit of earnest money: $150,000.00 (in fact, MFI has delivered the earnest money of $150,000.00);

   c.  Due diligence period: 90 days (if MFI chooses not to go forward after the due diligence period expires, the $150,000.00 will be returned to MFI);

   d.  Additional deposit of earnest money on the 90th day (assuming that MFI opts to proceed after the 90-day due diligence period): $150,000.00;

   e.  Closing to occur not less than 30 days after the expiration of the due diligence period (the Debtor keeps the entire $300,000 of earnest money if MFI does not close on the sale);

   f.  Additional deposit for the first 30-day extension (if requested by MFI) after the expiration of the 90-day due diligence period: $100,000.00;

     g.  Additional deposit for the second 30-day extension (if requested by MFI) after the expiration of the 90-day due diligence period: $100,000.00; and

     h.  If MFI does not go forward with the sale after obtaining the additional extensions, then it will forfeit to the Debtor all of the earnest money (i.e., $300,000.00) and the additional deposits (i.e., $200,000.00).

12. The liens on the Entire Tract as of December 1, 2017, are as follows:

     a.  CC3's lien (assuming interest only at the non-default rate is allowed): $17,774,853.09 [CC3's Ex. No. 5]; and

     b.  Ad Valorem taxes owed to Harris County: $1,038,365.29.[4]  [Debtor's Ex. No. 4]

13. If the sale to MFI under the PSA closes, then the commission to be paid to the real estate broker (i.e., JLL) will total $397,293.34 and the title fee and closing costs will be $74,689.66. [Debtor's Ex. No. 4].

14. After MFI made its initial offer to the Debtor, the parties conducted extensive negotiations over numerous issues, including the price, the length of the due diligence period, the amount of earnest money, the length of any extension periods, and the amount of any further non-refundable deposits that would need to be made if MFI seeks to extend a deadline.  These negotiations were conducted between very seasoned and capable real estate attorneys representing the parties: Marvin Nathan for the Debtor and Lee Schlanger for MFI.  All of these circumstances reflect that the negotiations were conducted at arm's length.  As one example of these arm's length negotiations, MFI's initial offer was for

---

[4] This figure is the sum of $213,861.66 (2015 unpaid taxes), $230,587.30 (2016 unpaid taxes), and $593,916.33 (2017 unpaid taxes). The Debtor has a suit pending in the Harris County District Court challenging the amount of these taxes.

$110 per square foot, whereas the final per square foot price in the PSA is $135.  Other

indicia of this arm's length relationship are as follows:

    a.  MFI has never purchased any properties from the Debtor;

    b.  MFI has never purchased any properties where JLL has been the broker;

    c.  Earnest money of $150,000.00 is typical for purchases of property of the size and

       value of the Property;[5]

    d.  The PSA gives MFI a 90-day due diligence period.  This provision was negotiated

       between the parties.  A due diligence period of 90 days is quicker than a normal

       due diligence period for purchases of undeveloped property of the size and value

       of the Property.  In fact, MFI's representative (i.e., Fein) credibly testified that the

       90-day due diligence period "is on the short end" and that he would have

       preferred a period ranging between 120 days to 150 days.  Indeed, he testified that

       MFI has never agreed to a due diligence period as short as 90 days, but that he

       believes that MFI can complete its due diligence within this 90-day window

       because at this point in time, MFI does not have many ongoing projects.

15. The PSA has no financing contingencies.  MFI will pay cash of $19,865,000.00 at

closing, and the closing agent will immediately pay the liens held by the taxing authority

and CC3.  MFI will procure the funds through institutional lenders from whom it has

borrowed in the past, including Guardian Life Insurance Company, Black Rock

Investments, J.P. Morgan, Wells Fargo, and Mutual of Omaha Insurance Company.  MFI

---

[5] CC3 contends that the earnest money amount should be between 5% and 10% of the purchase price.  Both the Debtor and MFI, through their respective representatives, gave testimony that: (a) this percentage is much higher than industry standards given the size and value of the Property; and (b) the amount of $150,000 is much more in line in a commercial real estate transaction of this size.  CC3 did not introduce any convincing evidence controverting this point.  The Court finds that the testimony of the representatives of the Debtor and MFI is credible and therefore finds that the $150,000.00 earnest money is within the realm of reasonableness for a transaction of the size for which this Court's approval is requested.

is confident—legitimately so, in this Court's eyes—that it will be able to procure financing given its successful track record constructing luxury apartments and paying off its lenders.   Indeed, its success was underscored in 2016, as it was one of the few developers in Houston—which has a glut of apartment complexes—to complete an apartment complex.

16. MFI's history reflects that once it enters into a contract to purchase real estate, it actually ends up closing on the contract 98% of the time.

17. MFI intends to develop the Property as a luxury apartment complex.   This particular complex will cost $60 to $70 million to construct and will be a medium-rise building comprising approximately 300 units.   Development of luxury apartment complexes of this type and size is in the ordinary course of MFI's business.

18. MFI will spend approximately $300,000-$500,000 during the 90-day due diligence period.   These funds will be spent on structural engineers, civil engineers, mechanical engineers, environmental engineers, architects, and waterproof consultants, all of whom will submit reports to MFI so that it can assess the feasibility of the project and decide whether to go forward in constructing the luxury apartment complex.   MFI has already lined up these engineers and consultants, and they will begin their respective assignments as soon as this Court approves the Motion.   The $300,000-$500,000 is "at risk" money. That is, if MFI decides not to go forward with the PSA after the 90-day due diligence period has expired, it will not be able to recover the $300,000-$500,000 from the Debtor.

19. The Debtor's Schedule F represents that the total amount of unsecured debts is $685,325.25.  [Debtor's Ex. No. 3].

20. Assuming that the closing occurs on the sale of the Property to MFI, the Debtor will still own the remaining 2.019 acres of the Entire Tract. The Debtor believes that this acreage has a stand-alone value of $11,755,000.00, and the Debtor intends to seek refinancing using this acreage as collateral. The Debtor believes it will be able to obtain a loan with a 25% loan to value ratio, which means that the Debtor will be able to obtain a loan of approximately $2.9 million. This amount will be more than sufficient to pay all claims that have not already been paid from the sale proceeds of MFI's purchase of the Property.

## III.   CREDIBILITY OF WITNESSES

Three witnesses testified at the hearing on December 7, 2017. First, David Schmidt ("Schmidt"), the Debtor's representative testified. Second, Martin Fein, the principal of MFI, testified. Finally, Simond Lavian ("Lavian"), CC3's director of asset management, testified. The Court finds that all three of these individuals testified forthrightly, and the Court finds their testimony to be credible. However, the Court gives more weight to the testimony of Schmidt and Fein than to the testimony of Lavian, as they gave more precise and persuasive answers to the questions posed to them than did Lavian. Indeed, Schmidt and Fein spent more time in the witness box and fielded more questions than did Lavian, and their testimony covered more issues that are germane to the Court's ruling granting the Motion.

## IV.   CONCLUSIONS OF LAW

### A. Jurisdiction, Venue, and Constitutional Authority to enter a Final Order

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the

bankruptcy judges for that district.  28 U.S.C. § 157(a).  In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because its resolution affects the administration of the Debtor's Chapter 11 bankruptcy estate.  Further, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N) because it involves a proposed sale of property of the estate—i.e., the Property.  This dispute is also a core proceeding under 28 U.S.C. § 157(b)(2)(O) because the sale of the Property will necessarily adjust the relationship between the Debtor and its creditors: the sale proceeds will be used to pay some, if not all, of the creditors.  Finally, this dispute is a core proceeding under the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.)*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under §157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *Ginther Trusts v. Ginther (In re Ginther Trusts)*, 2006 WL 3805670, at *19 (S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").

Venue is proper pursuant to 28 U.S.C. § 1408(1) because the Debtor's only asset (i.e., the Entire Tract) was located in the Southern District of Texas for the 180 days preceding the Petition Date.

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any matter brought before it.  In *Stern*, which involved a core proceeding brought by the

10

debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503. As already noted above, the pending matter before this Court is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here. Core proceedings under 28 U.S.C. §§ 157(b)(2)(A), (N), and (O) are entirely different than a core proceeding under 28 U.S.C. § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *Tanguy v. West (In re Davis)*, 538 Fed. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. West.*, 134 S. Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding herein.").

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under 28 U.S.C. § 157(b)(2), *see First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.)*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern,*

the debtor filed a counterclaim based *solely* on state law; whereas, here, this dispute (whether the sale of the Property should be approved) is governed by an express provision of the Code (i.e., § 363) and Bankruptcy Rule 6004, as well as judicially-created law from federal courts about the appropriate interpretation and application of § 363.  There is simply **no** state law involved in the matter before this Court.  Rather, the matter before the Court involves solely bankruptcy law. For all of these reasons, the Court concludes that it has the constitutional authority to enter a final order on the Motion.  *See, e.g.*, *In re Junk*, 566 B.R. 897, 904 (Bankr. S.D. Ohio 2017) ("The constitutional authority to enter a final order also extends to [the Chapter 7 trustee's] request to sell property of the estate under § 363(b) of the Bankruptcy Code."); *Watson v. LLP Mortgage, Ltd. (In re Watson)*, 2016 WL 3349666, at *8–9 (D. V.I. June 15, 2016) (holding that the bankruptcy court had the constitutional authority to enter an order approving the Chapter 7 trustee's sale of estate property).

Finally, in the alternative, this Court has the constitutional authority to enter a final order because the parties have consented to adjudication of this matter by this Court.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."). Indeed, the Debtor filed the Motion; CC3 filed a limited objection to the Motion; CC3 then filed an amended limited objection to the Motion; the Debtor thereafter filed a supplement to the Motion; CC3 filed yet another amended objection to the Motion; the parties appeared and participated at the hearing on the Motion held on December 7, 2017; and at no time did the Debtor or CC3 ever object to this Court's constitutional authority to enter a final order on the

12

Motion. Indeed, in the Motion, the Debtor consented [Doc. No. 18, para. 3, p. 2 of 8]; and in its amended objection, CC3 did as well [Doc. No. 33, para. 20, p. 6 of 8]. If these circumstances do not constitute consent, nothing does.

For all of the reasons set forth above, this Court concludes that it has constitutional authority to enter a final order on the Motion.

### B.   Application of the Relevant Law to the Dispute at Bar

1.   Application of the *Continental Airline* factors

Although CC3 vehemently opposes the Motion, CC3 agrees with the Debtor on one issue: the case that governs this dispute is *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In Re Continental Airlines, Inc.)*, 780 F.2d 1223 (5th Cir. 1986). In this case, the Fifth Circuit held that a sale of estate property outside the ordinary course of business is allowable but not simply because a debtor requests approval. Rather, the debtor must articulate a sound business reason for the proposed sale and prove that the sale is in the best interest of the estate. *Id.* at 1226.

*Continental Airlines* also holds that in determining whether the debtor's business justification is sufficient this Court

> should consider all salient factors pertaining to the proceeding and, accordingly act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely provide guidance to the bankruptcy judge.

*Id.* at 1226 (quoting *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983)).

13

Analysis of the *Continental* factors in the case at bar leads this Court to find that the Motion should be approved:

      a. <u>Is there a sound business reason for the proposed sale such that it is in the best interest of the estate?</u>

The purchase price under the PSA is $19,865,000.00, and this purchase, if consummated, will be in cash. [Findings of Fact Nos. 11 & 15]. The Debtor accurately projects that as of March 7, 2018 (a plausible date for closing to take place given the 90-day due diligence period in the PSA), CC3's lien on the Entire Tract will be $18,262,615.84.[6] [Debtor's Ex. No. 4]. The Debtor also accurately sets forth that the existing tax lien totals $1,038,365.29. [Debtor's Ex. No. 4]. Further, the Debtor accurately sets forth that the broker's commission of 2% will be $397,293.34. [Debtor's Ex. No. 4]. Finally, the Debtor accurately projects that the title fee and closing costs will be $74,689.66. [Debtor's Ex. No. 4]. The sum of $18,262,615.84 and $1,038,365.29 and $397,293.34 and $74,689.66 is $19,772,964.13. Thus, all of these liens and expenses can be paid from the sale proceeds of $19,865,000.00, and there will be a surplus of $92,035.87. [Debtor's Ex. No. 4]. These funds can be used to pay administrative expenses and unsecured claims.[7] And, with all liens on the Entire Tract paid, the Debtor should be able to obtain financing on the 2.019 acres (which will be unencumbered at this point) in an amount to pay off any remaining claims in this case.

---

[6] The figure of $18,262,615.84 represents the sum of $17,474,382.16 (the amount owed as of the Petition Date) and $788,233.68 (the per diem of $4,865.64 at the non-default rate accruing after the Petition Date). [Debtor's Ex. No. 4].

[7] The Debtor has filed suit against the taxing authority in state court asserting that the past due tax bills aggregating $1,038,365.29 are much too high, and therefore the Debtor hopes to lower the tax amount through this suit. Thus, it is possible that at closing, the tax lien may be lower than $1,038,365.29, which in turn will increase the surplus funds available to pay administrative claims and unsecured claims. Of course, there will be taxes owed by the Debtor for each day in 2018 that the Debtor still has title to the Entire Tract, and under the PSA, the Debtor will be responsible to pay these taxes at closing. Hence, the projected surplus of $92,035.87 may end up being lower, depending upon whether the Debtor is successful in its suit against the taxing authority and the amount of taxes that accrue in 2018.

Under these circumstances, this Court finds that there is a sound business reason for selling the Property at this time. Stated differently, the pending sale of the Property is in the best interest of the estate. Indeed, payment of all claims is the quintessential definition of what is in the best interest of any bankruptcy estate. *In re Sasso*, 572 B.R. 331, 338 (Bankr. D. N.M. 2017) (approving a § 363(b) sale by holding that "[t]he Trustee's intent to sell the estate's interest in the Condo to provide creditor's with a meaningful distribution on their claims is a sound business reason justifying the sale.").[8]

b. <u>What is the proportionate value of the Property to the estate as a whole?</u>

The Property is proposed to be sold for $19,865,000.00. [Finding of Fact No. 15]. The value of the Entire Tract is $29,398,000.00. [Finding of Fact No. 6]. Thus, the Property's value is approximately 67.6% of the Entire Tract's value. Given that the sale of the Property will retire most, if not all, of the liens on the Entire Tract and leave the Debtor with a remaining asset (i.e., the other 2.019 acres of the Entire Tract) that has more than enough value to pay all other debts, the fact that the Property's value is 67.6% of the Entire Tract's value does not weigh against the Motion. If anything, it weighs in favor of approving the Motion.

c. <u>The amount of elapsed time since the filing</u>

The Debtor retained a very reputable broker (i.e., JLL) in August of 2017 (i.e., before the Petition Date); JLL proceeded to do its job and generate three offers for the Property during the

---

[8] This Court also notes that because CC3's lien will be paid in full, the Debtor satisfies the requirement of § 363(f)(3) that where a lienholder (here, CC3) opposes the proposed sale, the sale can nevertheless be approved because "the price at which such property is to be sold is greater than the aggregate value of all liens on such property." CC3 contends that it is entitled to post-petition interest at the default rate as well as its post-petition attorneys' fees, and that when these amounts are added to the sums already owed under the Note, the sale proceeds of $19,865,000.00 will not be sufficient to pay off its lien entirely. The Court rejects this argument for the purposes of ruling on the Motion because at this point, CC3 has filed no motion requesting interest at the default rate and its attorneys' fees nor has this Court entered an order granting such a request. *See In re Jack Kline Co., Inc.*, 440 B.R. 712 (Bankr. S.D. Tex. 2010); *In re Yazoo Pipeline Co., LP.*, 2009 WL 2851863 (Bankr. S.D. Tex. August 31, 2009). Indeed, the Debtor's counsel made it clear at the hearing on December 7, 2017 that the Debtor disputes any claim made by CC3 that it is entitled to post-petition interest at the default rate as well as its post-petition attorneys' fees. Because there is a bona fide dispute as to the amount of CC3's lien, § 363(f)(4) also authorizes approval of the Motion despite CC3's opposition.

ensuing three months [Finding of Fact No. 8]; and then the Debtor proceeded to conduct arm's length negotiations [Finding of Fact No. 14], resulting in the execution of the PSA and the filing of the Motion on November 27, 2017. [Finding of Fact No. 11]. Under these circumstances, there is nothing suspicious or unsatisfactory about the timing of the proposed sale of the Property. This factor therefore weighs in favor of granting the Motion.

### d. The likelihood that a plan of reorganization will be proposed and confirmed in the near future

There is no question that this case is a so-called single asset real estate case and, therefore, that §362(d)(3) applies. Under this provision, it is mandatory that this Court terminate, annul, modify, or condition the automatic stay unless the Debtor, by no later than the 90th day after the Petition Date, takes one of two actions: (a) files a plan of reorganization "that has a reasonable possibility of being confirmed within a reasonable time;" or (b) commences making monthly payments to the lienholder "in an amount equal to interest at the then applicable nondefault contract rate of interest." 11 U.S.C. § 362(d). Here, based upon the testimony given and arguments made at the hearing on the Motion and this Court's review of the Debtor's schedules, it appears unlikely that the Debtor will commence making monthly payments—as it has no cash to do so. However, it appears very likely that the Debtor will file a proposed plan of reorganization by December 29, 2017 (i.e., the 90th day after the Petition Date)—as the Debtor assuredly does not want to risk this Court's terminating, annulling, modifying or conditioning the automatic stay as to the Entire Tract. The question is whether this proposed plan will have a reasonable possibility of being confirmed within a reasonable time.

There is no question that if the Debtor files a proposed plan on or before December 29, 2017, this Court will hold a plan confirmation hearing by no later than February 15, 2018—so confirmation can certainly occur "within a reasonable time." Further, this Court believes that

there is a reasonable possibility of the Debtor confirming the plan that it assuredly will be filing. This is so because based upon language in the Motion and the testimony at the December 7, 2017 hearing it appears that the Debtor's plan will: (1) incorporate the provisions of the PSA into the plan's treatment of CC3's secured claim; and (2) provide that the Debtor will obtain refinancing on the 2.019 acres to ensure that all claims are paid in full. Keeping in mind that a plan is feasible—and therefore confirmable—if there is a reasonable likelihood that the plan payments will be made,[9] this Court finds that based upon the record made at the December 7, 2017 hearing on the Motion, there is a reasonable possibility of the Debtor confirming its soon-to-be-filed plan. In *Continental's* language, it is likely that the Debtor will file a plan that will be confirmed in the near future.

Under these circumstances, this factor weighs in favor of granting the Motion.

e. The proceeds to be obtained from the disposition of the sale vis-à-vis any appraisals of the property

At the hearing on the Motion, neither the Debtor nor CC3 introduced any appraisals on either the Entire Tract or the Property. Accordingly, the Court finds that this particular factor is inapplicable in the dispute at bar.

f. Whether the property is being used, sold, or leased

Here, a portion of the Entire Tract—i.e., the Property—is being sold outright to MFI. [Finding of Fact No. 11]. Meanwhile, the other portion of the Entire Tract—i.e., the 2.019 acres—will be used by the Debtor to assist it in obtaining a loan to pay off all claims that are not retired through the sale of the Property. [Finding of Fact No. 20].

---

[9] *In re Young Broadcasting Inc.*, 430 B.R. 99, 129–30 (Bankr. S.D.N.Y. 2010) ("The key issue in determining feasibility of the Committee Plan is whether it is reasonably probable that the Debtors will be able to pay the Debt . . .").

Under these circumstances, the Court finds that the Debtor's sale of the Property and use of the remaining 2.019 acres is appropriate; therefore, this factor weighs in favor of granting the Motion.

g.   Whether the property is increasing or decreasing in value

At the hearing on the Motion, neither the Debtor nor CC3 introduced any evidence as to whether the Entire Tract is increasing or decreasing in value. Accordingly, this Court finds that this particular factor is inapplicable in the dispute at bar.

In sum, of the seven factors identified in *Continental*, five weigh in favor of approving the Motion and two are inapplicable. Under all of these circumstances, this Court finds that the Motion should be approved.

2.   Discussion of other factors articulated in *In re Gulf Coast Oil Corp*, 404 B.R. 407 (Bankr. S.D. Tex. 2009)

In their pleadings and at the hearing on December 7, 2017, the parties cited various cases to this Court in support of their respective positions. However, one case that neither party cited is an opinion written by one of the undersigned judge's former colleagues, the Honorable Wesley W. Steen (who is now retired). In *In re Gulf Coast Oil Corp.*, 404 B.R. 407 (Bankr. S.D. Tex. 2009), Judge Steen reviewed the history of Fifth Circuit case law on selling assets through a motion instead of through a plan, and he articulated numerous factors to consider in assessing the suitability of selling a substantial asset pursuant to § 363(b). Some of these factors come from the Fifth Circuit's decision in *Continental*, and this Court has already reviewed those factors above. However, Judge Steen identified additional factors, and this Court believes that several of these factors are applicable in the case at bar. Analysis of these factors further underscores that the Motion should be approved.

18

a. Is there evidence of a need for speed?

*Gulf Coast* notes that not every sale is an emergency and that evidence of "a need for speed" should be taken into account when determining the suitability of a § 363(b) sale. *Id.* at 423. Here, the record reflects that the per diem interest accruing at the non-default rate is $4,865.64, and that the per diem interest accruing at the default rate is $7,077.29. [Finding of Fact No. 2]. The record is also clear that the Debtor wants to pay off the Note as quickly as possible to stop the significant interest accrual. Indeed, CC3 asserts that it is entitled to a per diem interest amount at the default rate—i.e., a per diem interest totaling $7,077.29.[10] The Debtor vigorously opposes this position, but notes that the risk of CC3 prevailing on this issue is all the more reason for the Debtor to pay off the Note as quickly as possible. MFI, through Fein's testimony, has made it clear that it will not begin its due diligence until this Court enters an order approving the sale. Thus, for each day that this Court does not approve the sale, significant interest is accruing and the closing on the sale to MFI is further delayed. And, for every dollar of interest that accrues under the Note, there is one less dollar available to pay other creditors. All of these circumstances underscore that there is a need for speed with respect to this Court approving the sale of the Property to MFI. As Judge Steen noted in *Gulf Coast* there are "situations in which immediate sale was necessary to avoid substantial expenses to preserve the property." *Id.* Here, this Court finds that this is one of those situations. This factor therefore weighs in favor of the Motion.

b. Has the Debtor facilitated competitive bidding?

Here, the Debtor retained a very reputable broker, who marketed the Entire Tract and received three offers on the Property. [Findings of Fact Nos. 7 & 8]. The broker then submitted these offers to the Debtor, who then conducted substantive negotiations with MFI through legal

---

[10] *See* footnote 8.

counsel—resulting in the drafting and execution of the PSA and the deposit by MFI of earnest money of $150,000. [Findings of Fact Nos. 11 & 14]. The Court finds that these circumstances reflect that the Debtor facilitated competitive bidding. This is not an instance where the Debtor's efforts to market the Entire Tract—to use one court's phrase—"have been informal and incomplete." *In re Angel Fire Water Co. LLC*, No. 13-10868 ta11, 2015 WL 251570, at *3 (Bankr. D. N.M. Jan. 20, 2015) (denying the proposed § 363(b) sale). This factor therefore weighs in favor of granting the Motion.

### c. Has the Property been aggressively marketed?

As noted in the paragraph immediately above, the Debtor chose a very reputable broker to market the Entire Tract, and the broker proceeded to pursue an aggressive marketing strategy as evidenced by the fact that three bona fide offers were generated, one of which has resulted in the PSA. [Findings of Fact Nos. 7, 8, 9 & 11]. This is not an instance where the Debtor failed to retain a real estate broker. *See e.g., In re Roussos*, 541 B.R. 721, 731 (Bankr. C.D. Cal 2015) (". . . he did not enter into a listing agreement with any real estate brokers . . ."). Rather, this is a case where due to its strong marketing efforts, the broker retained by the Debtor procured three bona fide offers for the Property over a three month period. [Findings of Fact Nos. 7 & 8]; *See e.g., In re Andresen,* 2006 WL 4481994 (Bankr. D. M.D. November 1, 2016) (""The broker actively and aggressively marketed the Property . . . the broker and the Trustee entertained a number of offers for the Property. The Trustee entered into a contract for the sale of the Property with a prospective buyer, subject to approval by this Court."). The Court finds that these circumstances reflect that there has been aggressive marketing of the Entire Tract in general and the Property in particular. This factor therefore weighs in favor of granting the Motion.

d.  Are the fiduciaries that control the Debtor benefiting from the proposed sale?

An entity that the debtor controls, or that the debtor's principal controls, must not benefit from the sale of the asset. *Gulf Coast*, 404 B.R. at 424.  These circumstances are not present here, as they have been in other cases where courts have denied the proposed sales. *See, e.g., In re Cloverleaf Enters., Inc.*, No. 09-20056, 2010 WL 1445487, at *3 (Bankr. D. Md. Apr. 2, 2010) (denying proposed sale where "[t]he only beneficiary of this transaction is [the debtor's] sole stockholder"); *In re Flour City Bagels, LLC*, 557 B.R. 53, 82 (Bankr. W.D.N.Y. 2016) (denying proposed sale because "[t]his is a situation where the insider was both the buyer and the entity in complete control of the seller.").  Here, the Debtor is not proposing to sell the Property to any insider or affiliate.  Indeed, the testimony is clear that the Debtor and MFI have never done business in the past and were brought together solely through the efforts of the broker. [Finding of Fact No. 14].  This factor therefore weighs in favor of granting the Motion.

e.  Who will benefit from the proposed sale?

The immediate beneficiaries of the proposed sale of the Property are CC3 and the taxing authorities, as they will be paid at the closing.  [Finding of Fact No. 15].  Although unsecured creditors will not be paid at the closing, the proposed sale of the Property indirectly benefits them because it allows the Debtor, who will still own 2.019 acres after the closing, to more easily obtain financing to completely pay off the unsecured creditors.  [Finding of Fact No. 20].  This factor therefore weighs in favor of granting the Motion.

f.  Was the hearing a true adversary presentation?

If a § 363(b) motion is brought too early in a case or is unopposed, the Court should look more carefully at the appropriateness of the proposed sale. *Gulf Coast*, 404 B.R. at 427.  Here, the Motion was not brought too early; rather, it was brought almost two months after the Petition

21

Date and only after the broker had aggressively marketed the Entire Tract for three months. [Findings of Fact Nos. 5, 7 & 8]. Moreover, CC3 filed pleadings strongly opposing the Motion; this Court held a hearing, at which time both the Debtor and CC3 introduced exhibits and adduced testimony from the representatives of the Debtor, MFI, and CC3; and this Court then took the matter under advisement to reflect upon the record that was made and the arguments lodged by counsel. Under these circumstances, there is no question that due process has been accomplished and that a truly contested hearing took place. This factor therefore weighs in favor of granting the Motion.

> g. How burdensome would it be to propose the sale in a Chapter 11 plan and obtain confirmation thereafter?

When determining whether to grant a § 363(b) sale, the burden of selling the asset pursuant to a plan should be taken into account. *Id.* at 424. Here, there is no doubt that the Debtor could file a plan that proposes to sell the Property to MFI—and, indeed, the plan that the Debtor will likely file by December 29, 2017 will set forth that CC3's claim will be paid from the sale of the Property.[11] However, there was testimony from Fein that MFI will only begin to undertake its due diligence when this Court enters an order approving the PSA. By seeking such approval through prosecuting the Motion, the Debtor can obtain an order from this Court approving the PSA much more quickly than it can through the plan confirmation process. Under the latter approach, the Debtor must file a disclosure statement and plan, and then obtain approval of the disclosure statement and confirmation of the plan. A confirmation hearing could

---

[11] December 29, 2017 is the 90th day following the Petition Date. Section 362(d)(3) sets forth that in a single asset real estate case—such as the case at bar—a debtor must file a plan by the 90th day or begin making monthly cash payments to the lienholder, and if neither of these events occurs, then this Court must terminate, annul, modify, or condition the automatic stay with respect to the lienholder's collateral. Given this statutory requirement, this Court has little doubt that the Debtor will file a proposed plan by December 29, 2017, as it does not want to risk this Court lifting or modifying the stay as to the Property—which could inhibit MFI from going forward with its due diligence and, instead, convince MFI to terminate the PSA and look for other raw land to purchase.

22

not be held for several weeks in accordance with the applicable Bankruptcy Rules 3017 and 3018. Hence, an order confirming the plan (which would approve of the PSA) simply cannot be obtained as quickly as an order approving the Motion. Thus, under the plan confirmation approach, MFI would not begin to undertake its due diligence until February 2018 (at the earliest), which in turn would significantly push back the date for closing, and in turn cause more interest to accrue under the Note. Given that there is a need for speed to close in order to stop the substantial interest accruing daily under the Note, the Debtor is justified in seeking to obtain approval of the sale through the Motion rather than through the plan confirmation process— particularly when CC3 intends to seek post-petition interest at the default rate as well as post-petition attorneys' fees.[12] Thus, this factor weighs in favor of granting the Motion.

### h. Other factors to consider

*Gulf Coast* noted that "[e]ach case is unique. There may be other factors that tip the balance or that overweigh the evaluative factors set forth above." *Id*. at 427. Here, there are four other factors to consider. First, has the Debtor disclosed all of the terms of the proposed transaction? In *Flour City*, the debtor did not disclose that releases would be executed, or the reasons for the releases; nor did the debtor disclose that an extra $300,000 would be paid to the debtor's counsel. 557 B.R. at 83. Here, the Motion makes complete disclosure by attaching the PSA as an exhibit; and the PSA is a 23-page single-spaced document that describes in detail all of the terms and conditions of the proposed sale. [Finding of Fact No. 11]. There is no hidden agenda.

Second, can CC3, as the objecting party, defeat any plan of reorganization proposed by the Debtor that contains the provisions of the PSA? Stated differently, if the Debtor submits a plan that incorporates the PSA's terms into the plan section treating CC3's secured claim—i.e.,

---

[12] *See* footnote 8.

proposes to pay CC3's claim by selling the Property and immediately remitting the sale proceeds to pay the claim—would CC3 be able to successfully object to such a plan on the grounds that it was unfair and inequitable under § 1129(b)(2)(A)? This Court does not believe such an objection would be successful because § 1129(b)(2)(A)(i)(II) sets forth that the treatment is fair and equitable if the secured creditor receives a deferred cash payment totaling at least the allowed amount of the claim. The Motion and the attached PSA leave no doubt that whenever closing takes place in 2018, the debt that is owed to CC3 under the Note will be immediately paid from the sale proceeds. Moreover, if the debt is not totally paid in full from these sale proceeds, CC3 will still have a lien on the 2.019 acres; and this Court has no doubt that based upon the testimony given by the Debtor's representative, any plan to be filed by the Debtor will include language that CC3 will retain its lien on this acreage, and will be paid through refinancing or perhaps the subsequent sale of this acreage. Thus, because it is highly doubtful that CC3 could defeat any proposed plan to be filed by the Debtor that incorporates the provisions of the PSA and preserves CC3's lien on the remaining 2.019 acres, CC3's argument that the Motion tramples over its rights in the plan confirmation process is not particularly compelling.[13]

Third, the very credible testimony from Schmidt and Fein is that the parties did in fact negotiate at arm's length. For example, MFI submitted an initial offer of $110 per square foot and requested a due diligence period of 150 days. [Finding of Fact No. 14]. The Debtor clearly rejected this offer, as the final terms set forth in the PSA reflect a per square foot price of $135 and a due diligence period of 90 days. [Finding of Fact No. 14]. Moreover, both MFI and the Debtor retained very seasoned, extremely competent real estate attorneys to represent them and

---

[13] *See* CC3's amended objection for its scant argument regarding being deprived of its rights under the plan confirmation process. [Doc. No. 33, para. 16, p. 5 of 8].

assist in the negotiations. [Finding of Fact No. 14]. Indeed, these attorneys drafted a very detailed, 23-page single-spaced PSA setting forth the terms and conditions of the proposed sale. [Finding of Fact No. 11]. Finally, the Debtor and MFI are two completely independent unrelated and unaffiliated parties who have never done business with one another. [Finding of Fact No. 14]. Under all of these circumstances, this Court finds that the parties conducted arm's length negotiations. This factor therefore favors approval of the Motion.

Finally, MFI has been proceeding in good faith. It retained its longstanding outside real estate counsel to negotiate and help draft the PSA [Finding of Fact No. 14], and has therefore spent its own good money on very capable counsel. MFI has also deposited $150,000.00 of earnest money [Finding of Fact No. 11]. Further, MFI has retained a seasoned and very capable bankruptcy attorney (Julia Cook) to represent it at the hearing on the Motion (and at all future hearings in this Court), and therefore MFI has also paid more money from its own pockets to another attorney with specific expertise to represent its interests. Finally, MFI has lined up numerous engineers and consultants who will immediately begin their assignments if this Court approves the Motion. [Finding of Fact No. 18]. These facts, taken collectively, reflect that MFI has been proceeding in good faith. This factor therefore favors approval of the Motion.

In sum, the Court finds that eleven of the factors identified in *Gulf Coast* weigh in favor of approving the Motion. These circumstances, combined with the numerous *Continental* factors that weigh in favor of granting the Motion, lead this Court to conclude that the Debtor has carried his burden and that the Motion should be approved.

3. Specific arguments lodged by CC3 are not persuasive

In its pleadings, as well as during closing arguments made at the hearing on the Motion, CC3 has made several arguments opposing the Motion. The Court now addresses these arguments in turn, and finds that none of them are persuasive.

25

First, CC3 argues that in bankruptcy, sales made outside of the ordinary course of business must be done through an auction process where bid procedures and a "stalking horse" bidder are established. There is no question that one approach to selling assets out of bankruptcy is to establish bid procedures in a written order and then hold an auction—either in open court or at a private office (such as a law firm)—with the highest bid to then be approved at a subsequent hearing on a motion to sell. However, there is no provision in the Code that requires such an approach to be taken. In fact, Rule 6004(f)(1) expressly allows sales outside the ordinary course of business to be done through either a public auction or a private sale. This particular Rule, which is entitled "Conduct of Sale Not in the Ordinary Course of Business," expressly sets forth, in pertinent part, the following: "All sales not in the ordinary course of business may be **by private sale** or by public auction." (emphasis added) Case law supports this conclusion. *See In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D. N.Y. 1998) ("Unlike judicial sales under the former Bankruptcy Act, the sale of estate property under the Bankruptcy Code is conducted by a trustee, who 'has ample discretion to administer the estate, including authority to conduct public or private sales of estate property.'") (citations omitted); *Penn Mut. Life Ins. Co. v. Woodscape Ltd., P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("There is no prohibition against a private sale . . . and this is no requirement that the sale be by public auction."). Thus, CC3's argument that the motion should be denied because the Property is not being sold by public auction is simply off the mark.[14]

---

[14] The Court also notes that CC3 emphasizes that a sale of the Property through bid procedures and a public auction will result in a sale that will close much sooner than the pending sale to MFI (thereby, according to CC3, resulting in a quicker payoff of the debt owed to CC3). The Court does not believe that this is necessarily so. Establishing bid procedures would require the filing of a motion and holding a hearing thereon at some point in mid to late January of 2018. Then, after entering the bid procedures order, the auction would be subsequently held, probably in 45 to 60 days to allow for advertising that the Property will be sold. Thus, the auction would take place at some point in early to mid-March in 2018. Under the PSA, the 90-day due diligence period expires on March 11, 2018, and it is possible that MFI will be ready to close at that time. Even if it does not, closing will likely take place 30 or 60 days thereafter. If an auction was held in mid-March of 2018, the winning bidder would assuredly require a period of

Second, CC3 argues that the Debtor has not articulated a reasonable business justification for entering into the PSA. This Court disagrees. In its case-in-chief, the Debtor introduced credible testimony that: (1) it needs to sell the Property as quickly as possible so that it can pay off all existing tax liens and also pay down all of the debt owed to CC3—which, in turn, will stop the substantial per diem accrual of interest under the Note; (2) the purchaser (i.e., MFI) is not some "fly-by-night" undercapitalized real estate developer, but rather is a highly successful investor/luxury apartment complex developer who has been in the business for over forty years and has a proven track record of successful apartment projects in the greater Houston area [Findings of Fact Nos. 9, 10, 16, 17, & 18]—i.e, a purchaser that the Debtor does not want to risk losing by delaying approval of the PSA through the plan confirmation process; (3) the purchaser has access to millions of dollars of financing from large institutional investors, including several banks and insurance companies [Finding of Fact No. 15]; (4) the PSA contains earnest money provisions and provisions regarding extensions of deadlines that are typical of such contracts given the size and sale price of the Property; and (5) the PSA's 90-day due diligence period is actually a shorter period than a typical purchaser of raw land has in order to assess whether the proposed project is feasible. This Court notes that CC3 introduced no persuasive evidence to rebut any of the testimony that the Debtor adduced in this respect. In sum, this Court finds that the Debtor has demonstrated a reasonable business justification; indeed, this Debtor has found and brought to the table a well-heeled purchaser who, based upon its history, will very likely go forward and consummate the transaction. [*See* Finding of Fact No. 16].

---

time to undertake due diligence, which means that closing under this scenario would not take place until 60, 90, or 120 days later. To the extent that CC3 suggests that the bid procedures order should bar any due diligence period after the auction is held—i.e., that the winning bidder must close on, or a few days after, the day of the auction—such a requirement would chill the bidding and not maximize the value of the Property. It is doubtful that any serious prospective purchaser of the Property would purchase the Property without having a due diligence period, and no serious prospective purchaser is going to spend the necessary sums of money on due diligence **prior** to going to the auction, as they would be risking substantial funds without knowing whether they will end up being the highest bidder. Indeed, Fein credibly testified to this effect.

Third, CC3 contends that the Debtor is not fulfilling its fiduciary duty to creditors by prosecuting the Motion. The Court is at a loss to understand this particular argument. The Debtor certainly has a fiduciary duty to use reasonable care in making decisions, but once those decisions are made the Debtor is protected by the business judgment rule. *LaSalle Nat'l Bank v. Perelman*, 82 F. Supp. 2d 279, 292 (D. Del. 2000). "On the issue of the exercise of a debtor-in-possession's business decision and judgment, a debtor-in-possession's business decision 'should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" *G-I Holdings, Inc. v. Those Parties Listed on Ex. A* (*In re G-1 Holdings, Inc.*), 313 B.R. 612, 657 (Bankr. D. N.J. 2004) (citation omitted). Here, the Debtor wants to sell the Property so that it can pay off all tax liens and pay down all, or a substantial portion of, the debt owed to CC3—and then refinance the 2.019 acres so that all unsecured debts can be paid in full. The Debtor's objectives are certainly not "manifestly unreasonable" or pursued due to bad faith, whim or caprice. *Id.* Contrary to CC3's contention, this Court finds that the Debtor's prosecution of the Motion very much represents an attempt to fulfill its fiduciary duty to creditors by actually paying their claims in full as soon as possible. This is not an instance where—as this Court has seen from time to time—the Debtor is attempting to sell the Property and deposit the proceeds into the registry of the court on the pretext (sometimes quite flimsy) that the Debtor disputes the liens and wants to prosecute an adversary proceeding before any distribution is made. Nor is this an instance where—as this Court has seen from time to time—the Debtor is attempting to sell the Property and seek this Court's permission to use some of the sale proceeds for purposes other than paying the lien holders. Here, the Debtor actually wants to pay the liens on the Entire Tract, including CC3's liens. Moreover, this is not an instance where the Debtor has rigged the sale of the

28

Property by ensuring that only MFI could purchase it; the Debtor actually hired a legitimate real estate broker who marketed the Entire Tract, received three offers for the Property, and forwarded these offers to the Debtor, who then negotiated at arm's length with MFI to obtain the PSA. [Findings of Fact Nos. 7, 8 & 14]; *Cf. Cloverleaf Enters., Inc.*, at \*3 (denying a proposed sale of assets under § 363(b) because, among other reasons, "[w]hat the Debtor did here is to decide, at the time of the filing of the case, that it would sell out to Mr. Vogel. To that end, it negotiated an agreement that precluded the marketing of its assets to anyone else."). For all of these reasons, this Court rejects CC3's assertion that the Debtor is somehow violating its fiduciary duty to creditors by prosecuting the Motion.

Fourth, CC3 argues that the Motion "constitutes an impermissible *sub rosa* plan which cannot be approved absent the approval of a disclosure statement and voting as indicated in *In re Braniff*." [Docket No. 33, ¶ 16, p. 5 of 8]. This Court disagrees. In *Braniff*, the Fifth Circuit reversed the approval of the transaction because: (1) the Court found that the transaction established the terms of a Chapter 11 plan *sub rosa*; (2) the transaction required secured creditors to vote a portion of their deficiency claim in favor of a plan supported by the unsecured creditor's committee; and (3) the transaction required all parties to release claims against the debtor. *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939–40 (5th Cir. 1983). In the case at bar, the transaction memorialized by the PSA contains none of these requirements. The Debtor is simply requesting approval to sell a portion of the Entire Tract, and to have the sale proceeds immediately distributed to pay liens, including CC3's lien. Indeed, here, the Debtor has not yet filed a plan, nor does the Motion request that any of the lienholders vote in favor of any future plan that the Debtor files. Moreover, the Motion does not request that CC3 release its lien against the Entire Tract; rather,

29

CC3's lien on the Property will attach to the sale proceeds (and be paid immediately at closing), and CC3 will keep its lien on the remaining 2.019 acres that the Debtor will still own.  The facts here are simply completely distinguishable from the facts in *Braniff*.

Moreover, in *Continental*, the Fifth Circuit stated the following:

> ...we hold that when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied. If the court concludes that there has in actuality been such a denial, it may then consider fashioning appropriate protective measures modeled on those which would attend a reorganization plan.

*Continental*, 780 F.2d at 1227.

Here, CC3 has failed to specify just exactly what protections it is being denied as a result of the Debtor's proposal to sell the Property pursuant to the Motion instead of as part of a plan of reorganization.  This Court finds that CC3 is not being denied any protections.  Indeed, when the Debtor files a proposed plan—as it is highly likely to do by December 29, 2017[15]—CC3 will be protected by all of the provisions of the Code and the Bankruptcy Rules, and CC3 will have the right to vote on the plan, to object to the plan, and to appear and be heard at the plan confirmation hearing.

Finally, to the extent that CC3 suggests that the Motion should be denied on the grounds that the *Braniff* holding bars the sale of the Property because it represents a sale of substantially all of the Debtor's assets, this argument is also off the mark. In *Braniff*, the Fifth Circuit expressly declined to hold that the sale of all estate property was *per se* improper; it simply listed the problems in the transaction at issue in that case that improperly interfered with "the Code's carefully crafted scheme for creditor enfranchisement where plans of reorganization are concerned." 700 F.2d at 940.  In fact, in opinions issued since *Braniff*, the Fifth Circuit has

---

[15] *See* footnote 11

given its blessing to the disposition of substantially all of estate assets through a motion so long as the Code's plan provisions are not gutted by the transaction. *See, e.g., Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajon Elec. Power Co-op., Inc.),* 119 F.3d 349 (5th Cir. 1997).

In sum, none of CC3's arguments opposing the Motion are persuasive, and this Court rejects all of them.

### 4.  Relief Requested by CC3

In the first instance, CC3's amended objection requests this Court to simply deny the Motion based upon the arguments discussed above. However, CC3 requests alternative relief if this Court grants the Motion. Citing § 363(e), CC3 requests the Court to condition the sale of the Property by requiring the Debtor to provide adequate protection under § 361. Specifically, CC3 argues that the form of adequate protection should be to require the Debtor: (1) to immediately pay in full all of the taxes owed on the Entire Tract (i.e., $1,038,365.29); and (2) to immediately begin making monthly payments to CC3 in the amount of $210,000 (representing the amount of default interest that accrues each month under the Note).

The Court declines to award this form and amount of adequate protection. The uncontroverted evidence is that the value of the Entire Tract is $29,398,000.00 and that the amount owed to CC3 as of December 1, 2017, is $17,774,853.09. [Findings of Fact Nos. 6 & 12]. Thus, CC3 is oversecured by approximately $11.5 million. There is ample case law holding that adequate protection already exists when there is a substantial equity cushion. *In re Shivshankar P'ship LLC,* 517 B.R. 812, 817 (Bankr. E.D. Tenn. 2014) ("In addition to the statutory forms found in §361, adequate protection may also be accomplished through the existence of an equity cushion, or 'value in the property, above the amount owed to the secured creditors . . . that will shield that interest from loss due to a decrease in the property's value

31

during the time the automatic stay remains in effect.'") (citation omitted); *In re Johnson*, 90 B.R. 973, 979 (Bankr. D. Minn 1988) ("The primary factor in determining the existence of adequate protection in this case is the existence of an adequate equity cushion . . . . Many courts find that a creditor's interest is adequately protected if the value of the security alone exceeds the amount of its claim by a sufficient amount.").

To emphasize just how much adequate protection CC3 presently has, this Court has analyzed what it understands CC3 contends—without any evidence—is likely to happen if this Court approves the Motion.  Specifically, CC3 contends that MFI will not only use the entire 90-day due diligence period, but will also invoke the PSA's provisions allowing it to obtain two 30-day extensions.[16]  Assuming that this scenario actually occurs, and assuming also that this Court allows CC3 to recover interest at the default rate and its post-petition attorneys' fees,[17] the numbers still reflect that CC3 is very much adequately protected.  Under this scenario, the closing will take place on May 11, 2018, and the proceeds from the sale of the Property would be distributed as follows:

---

[16] The Court notes that at the hearing held on December 7, 2017, CC3 expressed great unhappiness with the amount of time that MFI has to perform its due diligence.  According to CC3, the due diligence period should be much shorter than the initial 90-day period allowed by the PSA.  Further, according to CC3 the two 30-day extension periods are unreasonable.  Yet, in 2014, when the Debtor purchased the Entire Tract, the Debtor had 120 days to undertake its due diligence, and, in fact, the closing in that year did not occur until 170 days after the initial purchase and sale agreement was executed.  [Finding of Fact No. 2].  CC3 failed to reconcile these facts at the hearing on December 7, 2017.

[17] This Court emphasizes that it will not approve CC3 recovering interest at the default rate or its post-petition attorneys' fees unless CC3 first files an application requesting such relief, and this Court thereafter enters an order granting the application.  *See In re Jack Kline Co., Inc.*, 440 B.R. 712 (Bankr. S.D. Tex. 2010); *In re Yazoo Pipeline Co., LP.*, 2009 WL 2851863 (Bankr. S.D. Tex. August 31, 2009).  The Debtor's counsel made it clear at the December 7, 2017 hearing that the Debtor will oppose CC3's request for this relief; therefore, at this time, CC3 should not assume that it will actually obtain this relief merely by filing an application.

|  | Sale Proceeds: | **$19,865,000** |
|---|---|---|
| Less: | Tax Liens for 2015, 2016 and 2017: | $1,038,365 |
| Less: | Prorated Taxes for 2018 through May 11, 2018 (educated guess assuming that the Debtor fails in its suit to lower the taxes from past years) (estimated 4.5 months/12 months x $600,000): | $225,000 |
| Less: | CC3's lien as of December 1, 2017 (at the non-default rate): | $17,774,853 |
| Less: | JLL Commission: | $397,294 |
| Less: | Title Fee and Closing Costs: | $74,690 |
|  | **Amount of Proceeds Available to Pay CC3's Post-Petition Interest and Reasonable Attorneys' Fees:** | **$354,798** |
| Less: | Additional interest from the Petition Date up to December 1, 2017 (assuming the default rate is used) ($2,211.65 x 62 days): | $137,122 |
| Less: | Accrued Interest at the Default Rate, plus Service Fees from December 1, 2017 to May 11, 2018 (162 days x the per diem of $7,133.74): | $1,155,666 |
| Less: | Estimated Attorneys' Fees: | $10,000 |
|  | **Amount of Shortfall:** | **$947,990** |

     The chart above reflects that the sale of the Property under the PSA will be sufficient to pay all tax liens and a substantial portion, but not all, of the debt owed to CC3. Viewed in a vacuum, these figures reflect that the proposed sale does not adequately protect CC3. Indeed, CC3 argues as such.

     However, this argument fails to recognize that after the sale of the Property, the Debtor will still own the other 2.019 acres of the Entire Tract—and there is no question that CC3 has a first lien on these 2.019 acres. The only evidence introduced at the hearing on the Motion as to

the value of these 2.019 acres came from the Debtor's representative, who testified that these acres have a value of $11,755,000. CC3 did not controvert this testimony, and given that this Court has found that the Debtor's representative is a very credible witness, the Court finds that the 2.019 acres has a value of $11,755,000. Thus, the shortfall of $947,990 from the sale of the Property will be secured by the 2.019 acres. Indeed, a quick calculation shows that CC3 will be adequately protected by more than 12 times the amount that will still be owed under the Note.[18] In fact, not only will the value of the 2.019 acres be sufficient to completely pay off CC3, the Debtor should be able to use the value of this acreage to pay off all unsecured claims—which total $685,325.00. [Finding of Fact No. 19]

The credible testimony from the Debtor's representative is that once the sale of the Property is completed, the Debtor will pay off CC3's balance (if any exists) and the unsecured creditors by obtaining refinancing on the 2.019 acres and/or by receiving cash infusions from equity. Given that the 2.019 acres has a value of $11,755,000, the Court finds that there is a reasonable likelihood that the Debtor will be able to obtain refinancing at a 25% loan to value ratio, which means that the Debtor will be able to obtain a loan of approximately $2.9 million. [Finding of Fact No. 20]. A loan of $2.9 million is more than sufficient to pay off the shortfall of $947,990 owed to CC3 and also to retire all of the unsecured claims, which total $685,325.00. [Finding of Fact No. 19]. Thus, the Court finds that there is a reasonable likelihood that the Debtor will be able to pay the remaining balance owed to CC3, any administrative claims (which primarily will be attorneys' fees owed to counsel for the Debtor), and all unsecured claims. Finally, even assuming that the Debtor is unable to obtain refinancing to pay CC3's remaining balance, CC3 will have the right to foreclose its lien on the 2.019 acreage that has a value greatly

---

[18] $11,755,000 divided by $947,990 equals 12.4.

in excess of the remaining balance.  As already noted above, such significant equity itself constitutes adequate protection.

## V.  CONCLUSION

Analysis of the *Continental* and *Gulf Coast* factors overwhelmingly indicates that the Debtor has met its burden to show that the proposed sale of the Property to MFI for $19,865,000 is entirely appropriate and in the best interests of the estate.  Therefore, the Court grants the Motion.

Finally, the Court finds it telling that CC3's representative, when testifying, stated that a major reason that CC3 opposes the Motion is that it typically only extends financing for no more than two years.  This is hardly a convincing basis for opposing the Motion.  Indeed, the very nature of the Chapter 11 process includes stretching out repayment of loans.  Nor does the fact that the Debtor has not made a payment to CC3 since April of this year provide a sound basis for objecting to the Motion.  Whether CC3 likes it or not, it is the envy of most secured creditors throughout this country insofar as there is substantial equity in CC3's collateral.  This fact, combined with the fact that the chances of MFI closing on the sale of the Property are very high, means that it is very likely that in 2018, CC3 will be paid in full.  Indeed, by granting the Motion, this Court believes that the chances of the Debtor paying not only CC3 in full, but all creditors in full, are maximized.

A separate order approving the Motion has already been entered on the docket.

Signed on this 20th day of December, 2017.

Jeff Bohm
United States Bankruptcy Judge